Filed 1/11/16  In re Hadley F. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| In re HADLEY F., a Person Coming Under the Juvenile Court Law. | C079471 |
| YOLO COUNTY DEPARTMENT OF EMPLOYMENT AND SOCIAL SERVICES,  Plaintiff and Respondent,  v.  BRANDY F. et al.,  Defendants and Appellants. | (Super. Ct. No. JV-SQ-13-0000102) |

Brandy F. (mother) and Brian F. (father) appeal from the juvenile court's order terminating parental rights.  (Welf. & Inst. Code, § 395; undesignated statutory references are to the Welfare and Institutions Code.)  Mother, joined by father, contends the court

1

erred by finding the beneficial parental relationship exception to adoption inapplicable. We affirm the juvenile court's order.

FACTS AND PROCEEDINGS

On March 8, 2013, Yolo County Department of Employment and Social Services (the department) filed a section 300 petition as to three-month-old minor Hadley F., alleging that in December 2012 a voluntary family maintenance case was opened for the parents; that father had an extensive criminal history and that mother abused methamphetamine and opiates while pregnant with the minor. The petition further alleged the minor was born prematurely and weighed less than three pounds; that on March 6, 2013, mother drove the minor to the hospital and was subsequently arrested for driving under the influence; and that father was arrested for willful cruelty to a different child. Finally, the petition alleged both parents were incarcerated.

On March 13, 2013, the juvenile court ordered the minor detained. The jurisdiction report stated that mother's drug of choice was methamphetamine; she claimed her last use was in October 2012. She tested positive for alcohol on January 4, 2013.

The juvenile court sustained the allegations of the section 300 petition as amended on April 3, 2013.

The disposition report recommended out-of-home care for the minor and reunification services for the parents. The minor was in the care of the maternal grandmother, Linda S., with whom one of mother's sisters and the sister's husband (the maternal aunt and uncle) also lived.

At the disposition hearing on June 27, 2013, the juvenile court ordered that the minor remain in the maternal grandmother's home and that the parents receive reunification services. The court found the parents' progress to date was minimal.

A status review report filed December 3, 2013, recommended maintaining the minor's placement and granting the parents additional reunification services, with a 12-month permanency review hearing to be set on or before April 3, 2014. The minor was thriving and had positive relationships with her caregivers. The parents were in danger of being discharged or suspended from their substance abuse programs, and were about to be evicted from their residence; father was unemployed, and mother had very recently begun a retail job.

On February 27, 2014, at the six-month hearing, the juvenile court found that the parents were complying with their program and testing negative for drugs; however, their progress remained minimal. The court set the 12-month hearing for April 3, 2014.

The 12-month status review report recommended an additional six months of services for the parents. They were living in a home where substance abuse occurred, but hoped to relocate to transitional housing. They were still engaged in services, but had trouble finding programs they could stay in. Visitation had recently been irregular, partly due to illness and transportation problems. The minor continued to thrive in the home of the maternal grandmother, aunt, and uncle, which was a prospective adoptive home.

At the 12-month hearing on April 3, 2014, the juvenile court ordered six more months of services for the parents and authorized the department to increase visitation.

An interim review report filed June 13, 2014, recommended another six months of services for the parents and the setting of an 18-month hearing for September 4, 2014. The parents' performance had recently declined. They had been discharged from substance abuse treatment and had not been testing; their visitation had been cancelled for failure to attend since April 7, 2014, when father tested positive for methamphetamine; and they had not been communicating with the department.

A status review report filed August 25, 2014, recommended terminating the parents' services and setting a section 366.26 hearing. The parents still did not have stable and appropriate housing. Father was incarcerated again, and had allegedly been

3

convicted of child endangerment as to the minor's older siblings. Mother had positive or presumptive positive tests in April and June 2014.

Visitation went well, but had been sporadic all along. Irregular visits could confuse a young child and prevent her from making a secure connection with the parents.

The parents repeatedly appeared to make progress, then relapsed. Since April 2014, they had done worse. They had not completed any of their services. During the previous three weeks, mother had found employment and tested negative but this was not enough to ensure continued progress.

The parents obviously loved the minor and interacted well with her in visits, but mother still lacked stable housing, and there was no evidence of long-term recovery or of a stable relationship between the parents. The parents would need another year to complete their services, but their time to do so had run out.
The caregivers remained willing to provide the minor with a permanent home.

After the contested 18-month hearing in October and November 2014, the juvenile court terminated the parents' services and set a section 366.26 hearing for March 19, 2015.

On February 18, 2015, the California Department of Social Services reported that the minor was adoptable and recommended adoption by the prospective adoptive parents, the maternal aunt and uncle, with whom she had lived for almost two years. (The maternal grandmother, with whom the maternal aunt and uncle and the minor still lived, did not wish to adopt.) The minor was a happy two-year-old, developmentally on target and enjoying preschool, who appeared to have substantial emotional ties to her caregivers and sought them out to meet her needs. Although the prospective adoptive parents had not yet completed an adoption home study, the preliminary assessment indicated that they were suitable to adopt the minor. The minor enjoyed visits from mother, which occurred once a month; she had one recent visit with father, and appeared to feel comfortable with him by the end of the visit. However, the termination of parental rights would not be

4

detrimental to the minor, and removing her from her current caregivers would be seriously detrimental to her.

The section 366.26 report, filed March 6, 2015, concurred in the adoption assessment's recommendation. The minor had lived with the prospective adoptive parents for most of her life; they had a nurturing and loving relationship with her, had met all of her needs, and were committed to adoption. They wanted ongoing contact with mother and visitation by the minor's siblings following adoption.

The parents' visitation had been irregular from January through October of 2014. Mother's attendance had been more consistent since then, but mother had often gone alone because father had been in and out of jail over the past year, and on the one occasion when father had a jail visit with the minor, it was very frightening to her. In general, the visits went well and raised few concerns. However, the visits amounted to playing with the minor rather than acting in a parental role, which the parents had not done since March 2013. It would be detrimental to the minor to return her to mother or to place her anywhere other than the home where she was now, which was the only home she had known.

On April 2, 2015, mother filed a section 388 petition, seeking renewed reunification or family maintenance services. Mother declared that she had been clean and sober for 12 months, attended AA meetings two to three times per week, and consistently tested negative; she had stable housing and employment, and a large support network which included her family; she took Zoloft for depression by prescription following a mental health assessment and was "medication compliant"; she had continued her mental health treatment; she had attended all allowed visits with the minor; whenever she visited, the minor was "overly excited" to see mother and wanted to go home with her at the end of the visit; she also had regular telephone contact with the minor three or four times per week; she had a new baby, born in January 2015, who was

5

healthy and happy and had not been the subject of any child welfare proceeding; father had been sentenced to five years in state prison.

Mother's current landlady, Sarah Card, wrote a letter attesting to mother's continuing sobriety, her bond with the minor and her new baby, and her hard work at Wal-Mart.

The juvenile court calendared the section 388 petition to be considered at the section 366.26 hearing.

At the consolidated section 336.26/section 388 hearing, mother testified as follows:

Mother's new baby was three months old. Mother had not been contacted about her by any social worker.

Mother had been clean and sober for just over a year and was not in any substance abuse treatment program. Her "clean date" was April 5, 2014. She denied that she had positive tests for methamphetamine and alcohol after that date. According to her such results had to be erroneous. She went to AA meetings a couple of times a week, avoided situations that could trigger her addiction, had a large support system, and kept herself "very, very busy." Her support system included her roommate Sarah Dixon, her sister-in-law, her sister, and her best friend.

During the roughly 12 months she had spent in substance abuse treatment programs, she had learned a lot about coping skills and relapse prevention, and she had used those skills to stay sober. She had been unable to complete any program because she moved repeatedly between counties.

Since mother's services were terminated, she had not participated in parenting classes, counseling, substance abuse treatment, or domestic violence services.

Mother had asked the social worker to look at mother's home, but the social worker had not done so. It was a four-bedroom, two-and-a-half-bathroom house in Woodland with a large fenced backyard. Besides mother and "Sarah," the residents

6

included Sarah's seven-year-old son and mother's newborn baby. Mother's roommate was willing to do a live scan for the department, but the department had never asked her to do so and had never told mother that this would be needed. Mother admitted that she had never given the social worker the address of her home, requesting instead that documents be sent to a mailing address.

Mother held two part-time jobs, one at Wal-Mart for 30 to 32 hours a week and one at a housecleaning service for five to 20 hours a week. She had worked at Wal-Mart since August 2014, and at the housecleaning service since March 2015. Her work hours varied, but could sometimes extend to midnight. Mother's roommate watched mother's infant when mother was working, or else the infant was taken to daycare.

Mother had taken Zoloft by prescription from her family doctor for over a year.

In addition to monthly visits, mother talked to the minor on the phone about once a night. Sometimes the minor would initiate the call by picking up the phone and asking someone to make the call for her. The calls would last anywhere from five seconds to 30 minutes, depending on what the minor had going on.

At the ends of visits, when mother would tell the minor that it was time for her to "go bye bye with momma," the minor would answer: "No. Go home with mommy."

Mother felt that it would be in the minor's best interest to provide mother with more services because they had a really close bond where "she knows I'm her mom," and because mother was in a position to meet all the minor's needs. She would be just as happy with mother as with her caregivers, and it would be "the best of both worlds" for her because she could benefit from her extended family while being with mother. Mother would "absolutely" maintain the minor's relationship with the maternal grandmother and the maternal aunt.

Mother continued:

During May and June of last year, when mother did not make any visits, she was living in Butte County and had transportation problems getting to Woodland. The

maternal grandmother was willing to bring the minor to mother, but the social worker would not authorize it.

The conditions of mother's life had not changed significantly from what they were when the juvenile court terminated her services: she was clean and sober then, lived in the same residence, and had the same Wal-Mart job. She felt, however, that these positive facts had not been reported or brought to the court's attention at that time.

Britt Hirschberg, who had supervised eight of mother's visits with the minor since September 2014, testified that the minor was happy to see mother when visits started, but also happy to see the maternal grandmother when visits ended. The minor did not run up to mother to greet her. She responded to mother with smiles and hugs, but gave the same response to the maternal grandmother. Hirschberg had never heard the minor say she wanted to go home with mother. The minor exhibited no distress on parting from mother.

Social worker Kathleen Clemons testified that she had had the case since December 2013. Mother was given 20 or 21 months of services before they were terminated.

Clemons had not seen mother's current home. Mother had never asked her to do so or given her a home address. However, even if Clemons found that the house was suitable for the minor and mother's roommates were cleared, it would not change Clemons's opinion as to whether it would be in the minor's best interest to reopen services for mother.

Clemons supervised a visit on March 27, 2015. It went well. The minor enjoyed playing with mother. But the minor was also happy to see the maternal grandmother at the end of the visit. During the visit, Clemons once had to redirect mother to spend time with the minor instead of interacting with Clemons.

Due to the sporadic, on-and-off nature of mother's visits, no close relationship between mother and the minor had been established, in Clemons's opinion. Telephone

8

contact would not establish or maintain such a relationship; only face-to-face contact could do so.

When the minor got hurt or upset, she would go to the maternal grandmother or the maternal aunt for comfort. She had the run of the house and got into everything. She was "just a part of the family" there. The interaction with mother was "more -- it's fun time. It's play time." Based on having observed numerous visits, Clemons opined that the minor did not seek mother out for comfort as much. Play was "pretty much . . . all they do."

Clemons was aware of several positive or presumptive positive drug tests after April 5, 2014. She knew that mother claimed one result was due to taking a medication which was suspended in alcohol, but Clemons had asked mother to provide the prescription or the bottle and mother had not done so.

It would not be in the minor's best interests to restart reunification services for mother. Since March 2013, mother had not resolved any issues or completed any treatment. Services had not been helpful, and restoring them would just continue the same pattern. Furthermore, the minor needed permanency planning, and it would be devastating to her to be removed to a new home; her adjustment would be very difficult. She was now in the stage of developing trust, and she trusted her current caregivers so much that there was no reason to remove her from that setting. The maternal grandmother had recently moved to a home in the back of the property to give the maternal aunt and uncle more space, so that the minor could have her own room; but the grandmother had daily contact with the minor.

Mother was likely to always be involved in the minor's life; the maternal grandmother had made that clear. However, Clemons did not know whether the minor identified her as "mother," or only as "someone that she knows." According to the maternal aunt and uncle, the minor called them "mom and dad." Clemons had never heard her call mother "mom." The maternal aunt greeted the minor as her child, and the

9

minor was extremely comfortable with her and looked to her to meet the minor's needs. The minor also treated the maternal grandmother as her mother.

The juvenile court denied mother's section 388 petition, finding that even if mother had shown a change of circumstances (which was questionable), it was in the minor's best interest to remain with the maternal aunt, uncle, and grandmother.

Turning to section 366.26, the juvenile court received the social worker's report into evidence without objection and obtained counsels' agreement that it could consider all testimony given in the section 388 hearing for purposes of section 366.26. No counsel offered any further evidence.

The juvenile court ruled that mother's visitation, even if regular, did not establish that the beneficial parental relationship exception to adoption applied. The minor was in a concurrent home and was adoptable. It was in the minor's best interest to terminate parental rights and proceed to adoption.

## DISCUSSION

Mother contends the juvenile court erred by finding the beneficial relationship exception to adoption did not apply. Father joins in mother's argument and contends that if this court reverses the termination of mother's parental rights it must also reverse the termination of his parental rights.

" 'At the selection and implementation hearing held pursuant to section 366.26, a juvenile court must make one of four possible alternative permanent plans for a minor child . . . . *The permanent plan preferred by the Legislature is adoption.* [Citation.]' [Citations.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368 (*Ronell A.*).)

There are only limited circumstances permitting the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the

10

child . . . ." (§ 366.26, subd. (c)(1)(B).) One of these is where the parent has maintained regular visitation and contact with the child *and* the child would benefit from continuing the relationship, often referred to as the beneficial parental relationship exception. (§ 366.26, subd. (c)(1)(B)(i).) The benefit to the child must promote "the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*); accord, *In re C.F.* (2011) 193 Cal.App.4th 549, 555 (*C.F.*).)

"Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350 (*Jasmine D.*).)

The party claiming the exception has the burden of establishing the existence of any circumstances that constitute an exception to termination of parental rights. (*C.F., supra*, 193 Cal.App.4th at p. 553.) The factual predicate of the exception must be supported by substantial evidence, but the juvenile court exercises its discretion in weighing that evidence and determining detriment. (*In re K.P.* (2012) 203 Cal.App.4th 614, 622; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.)

"On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in

11

support of the order." (*Autumn H., supra*, 27 Cal.App.4th at p. 576.) " '[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling . . . . Broad deference must be shown to the trial judge.' " (*Jasmine D., supra*, 78 Cal.App.4th at p. 1351.)

Even assuming that mother's visitation was sufficiently regular and consistent to satisfy the first prong of the beneficial parental relationship exception, substantial evidence supported the juvenile court's finding that mother's relationship with the minor was not positive and beneficial enough to outweigh the benefits of adoption.

The minor, who was clearly adoptable, had lived almost her entire life in the home of her prospective adoptive parents. She was emotionally attached to them, called them "mom" and "dad," and looked to them to meet her needs. Their ability to provide her a safe and loving home was undisputed. These facts, without more, are sufficient to support the juvenile court's ruling. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228-229-231; *Jasmine D., supra*, 78 Cal.App.4th at p. 1350.)

Furthermore, removing the minor from the only home she had known and placing her elsewhere would flout her need for permanence and stability, which is paramount at the selection and implementation stage. Even if the minor were not removed from that home, providing mother with further services, well beyond the statutory time limit for services, would be detrimental to the minor by leaving her situation unresolved. (Cf. *Autumn H., supra*, 27 Cal.App.4th at p. 575.)

Though mother had apparently stabilized her life to some extent, she had not completed any program or service in the 20 months allowed, had not engaged in any services on her own since the termination of those provided by the department, and had incurred positive drug and alcohol tests, not explained to the social worker's satisfaction, after her alleged "clean date." During visits with the minor, mother acted more as a playmate than a parent, and the minor did not show any distress when visits ended. Although mother claimed to be eager to take the minor into mother's home and to have

12

the social worker inspect it, mother impliedly conceded that she had taken no steps to give the social worker the physical address of the home or to have her housemates screened.

Against this strong evidence in support of the juvenile court's ruling, mother offered only her uncorroborated opinion, contrary to the testimony of the social worker and the visitation supervisor, that the minor was more closely bonded to her than to the minor's caregivers. The juvenile court impliedly rejected mother's opinion. On review, we must defer to the court's assessment. (*Jasmine D., supra*, 78 Cal.App.4th at p. 1351.)

Mother asserts that her parental rights should not be terminated because to do so could prevent contact between her and the minor, which she calls (without citing authority) "the primary factor that must be considered." Mother is legally and factually mistaken. Legally, once reunification has failed, contact between the birth parent and the minor is not "the primary factor that must be considered." The primary factor is the minor's need for permanence and stability, preferably through placement in an adoptive home, as here. (*Jasmine D., supra*, 78 Cal.App.4th at p. 1350; *Ronell A., supra*, 44 Cal.App.4th at p. 1368.) Factually, it is undisputed that the prospective adoptive parents and the maternal grandmother want to maintain contact between mother and the minor, and mother cites no evidence to suggest that that will not happen.

Mother asserts: "Quite frankly, all respondent has done in this case is simply rearrange deck chairs. Or to have the parties switch hats and labels." On the contrary, what the juvenile court has done is to implement the legislative preference for providing permanence and stability to adoptable minors by placing the minor in a permanent, stable adoptive home.

Mother asserts that the minor "is going to grow up knowing that appellant is her mother" and that the prospective adoptive parents are her aunt and uncle, not "mom and dad." However, mother cites no authority holding that the beneficial parental relationship

exception to adoption applies merely because the prospective adoptive parents are less closely related to the minor than is the birth parent.

Finally, mother asks rhetorically: "What, then, is the point of simply changing hats? Cui bono?" Mother's question is better directed to the Legislature, which has determined that it is in the best interest of adoptable minors to be adopted as quickly as possible, rather than waiting indefinitely for birth parents to reform.

Since mother has shown no grounds for reversing the termination of her parental rights, we also do not reverse the termination of father's parental rights.

DISPOSITION

The order terminating parental rights is affirmed.


                                        HULL            , Acting P. J.



We concur:



        DUARTE    , J.



        HOCH      , J.


14